Mr. Shapiro. Thank you, Mr. Chief Justice, and may it please the Court. We are here today to urge the Court to reinstate the district court's decision, which faithfully applied this court's precedents under Section 101 of the Patent Act. The problem with the Prometheus patent is its broad preemption of a physical   The patent is not a physical phenomenon. which prevents others like Mayo Clinic from offering a better metabolite test with more accurate numbers. And this is a huge practical problem for patients. These thiopurine drugs are strong medicine. Too much of this can be fatal. Too little can leave a chronic, lingering disease in the patient. I'm sorry. I didn't think that this patent covered the actual machine. Mayo is free to develop a new machine. Well, what it can't do is use any number from 400 up until infinity, and it believes that's the wrong number. And it can't have a different standard for a legion of autoimmune diseases, and there are dozens and dozens of them. That's a broad field to preempt the natural phenomenon. It actually is much narrower than that. It's within a range. Two ranges, actually. And so it has already changed one range, and that's not the subject of the district court's finding, that the lower number it's proposing is infringing. So it's not as broad as you're stating. Well, you see, Your Honor, we believe the correct number is 450 to 700, and that's necessary to cure various autoimmune diseases. And Prometheus took the position that its patent preempts everything above 400, all the way up to infinity, it said, for all autoimmune diseases. Dozens and dozens of them. Well, it took that position, but the district court narrowed it to 15 percent, to 15. You know, actually it didn't, Your Honor. You'll see in that opinion there are two rulings. One is the 15 percent ruling, which lowers the number, but it said 400 and above all the way to infinity. There's no upper limit on this. So as a practical matter, there's no room for anybody else to offer a metabolite test, and what this means for patients is one opinion in the United States. If you have one of these life-threatening diseases, you get one opinion. It can offer the test. Pardon me? It can offer the test. It just can't recommend the dosage to the doctor. Well, it can't have a test that has a different therapeutic range, because that's a preemption. They take the position. Tests do two things. They measure something. Yes. And therapeutic range does something else. The test can happen. The doctor gets a number. What the doctor does with that number is a different issue. And what Prometheus submitted and the Court agreed is if you are notified, if you are aware of their range, when you're drawing blood, that's an infringement right then and there, if you're aware or warned by their number. So any doctor in the United States that draws blood and is aware of this range of theirs is preempting. And the practical result is we haven't been able to offer this competing test now for seven years. When the Respondent addresses this, will they take issue with the way you describe what has been preempted? Or as you read their brief, I will ask them, but as you read their brief, is this crystal clear? Well, you'll see, Justice Kennedy, in the district court they argued for any number above 400. It's 400 and above is what it says. And they said there's no upper limit on that. The district court found that. That was their position. Kennedy, in thinking about what's preempted, I looked at the Dyer case involving the rubber molding and the constant monitoring. And if you could take an analogy from that, let's suppose that there was a system of measurements that you take every half hour which constantly monitor how a drug is being retained in the tissues, and that there is a protocol for the admission of some two or three different drugs to get the balance right. In other words, it's much more complicated. Is there some point at which that is patentable, even though this preempts a whole range of different choices? Well, it may be patentable. And it's hard for you to answer even if there's a million hypotheticals. But I'm just trying to see what the process is here. The key is the specificity. If it leaves room for others to have their own tests with different numbers and different procedures, so that it isn't just one test for the whole country, then, yes, if it's specific enough. Specificity is the key. What the Court said in Bilski, of course, is that you can't preempt the whole field, a broad field, with your patent, which this one does. And if you look at the diseases that are covered. I'm not comfortable with that. I mean, it depends on how broad it is? Yes. If you preempt all the numbers up to infinity and all autoimmune diseases, that's a vast field. It's much bigger than the field. What about up to 700? Is that okay? Well, no. I think. 550? No. 830? No. I mean, how are we supposed to apply that kind of rule? I think doctors have to have freedom to make their own judgments about these natural phenomena. Above 830 or below 830? Which? Well, no, I think. It seems to me not a patent rule that we could possibly apply. Well, it's the rule, I believe, adopted in Bilski and in Fluke, that you can't wipe out a whole field so no one else can have a competing test. The result for the public is that these numbers would be frozen for 20 years and a very different numbers. That's why we think. Doesn't any medical patent rely on natural processes? I mean, even if you invent a new drug, what that new drug does is natural. It affects the human physiognomy in a certain natural way. Oh, yes. Is it therefore precluded from patentability? No, it's not. And in fact, this was patented. So what's different here? The difference is the specificity. If you invent a drug which has a particular chemical formula, others can invent other drugs. There's room for competing drugs in the medical world. And you'll have many, many patented drugs. I thought your answer to Justice Scalia would be, and please correct me, the difference is that what the Respondent is claiming is a patent on the measurement of the result. Yes, it is a patent on the measurement. But you're giving different answers. I mean, that's how I would have answered the question. But that's obviously not the right way to do it. No, I think that's one part of it. Well, that's another one of your arguments. But one of your arguments says you can't patent nature. You can't patent nature. Right. And that simply relates to the question that I asked. Tell me why you can't patent nature, then. Because of the law of nature doctrine that's existed for 150 years in this Court, Congress has never disagreed with that. Pieces of nature can't be monopolized. Neither can formulas. Nature always has a reaction to the drug. Nature always has a reaction to the drug. Yes. So all doctors, that's part of the storehouse of information. All doctors can look at that reaction. They can calibrate it the way they see fit. They have different opinions. And it's important for all of us that they have those different opinions. We found that the numbers that they were using were way off for skin disorders, dangerously high. 400 is the wrong number. The correct number is 150 to 300. Now, it's very important for patients to be with life-threatening conditions to be able to get that information. All right. But how do you do that? I see that. I will spare you the reasons why I think the law of nature doctrine exists, because they are not relevant to my question. My question is I think it's Hornbook law that the law of nature cannot be patented. Yes. It is also Hornbook law that the application of a law of nature can be patented.  All right. So in this case, what I think the claim is, is that we are applying a law of nature. Now, we read the words of applying it. Administer a drug. Determine the level. And then it uses the word wherein, which I'll ask them what that means. But that so they say those two words, administer the drug, determine the level, are the application of the law of nature that they found. Now, there's something odd about that, in your view. Yes. At least. And I want to know what. For us, the real oddity is that this numerical calibration that they've given extends up to infinity, and it precludes every other blood test. I suppose it didn't. Suppose I discover that if I take aspirin, someone takes aspirin. I discover they take aspirin for a headache. And you know, I say an amazing thing. If you look at a person's little finger and you notice the color, it shows the aspirin you need a little more. Unless it's a different color, you need a little less. Now, I've discovered a law of nature, and I may have spent millions on that. And I can't patent that law of nature. But I say I didn't. I said apply it. I said look at his little finger. Sure. Okay? Is that a good patent or isn't it? No, it's not. Why not? It's not a good patent because You can tell me why not. I'll have an understanding of where you're coming from. Well, because you've added to a law of nature just a simple observation of the man's little finger. Ah, now we're into the problem. And that is the problem of how much you have to add. Yes. If you look at the Court's cases, they seem to say fluke one thing and deer another thing. And so what is your view about how much has to be added to make it an application of a law of nature, and how would you put that in words? There are several things that it can't be. After Bilski, which reaffirmed what was said in Fluke, a conventional step isn't sufficient because that's just adding a law of nature to prior art, and prior art plus prior art equals nothing that is patentable under the Fluke decision. And also, the step that you add has to narrow your preemption. Well, excuse me. Does that render it nonpatentable because it's not novel? Is that the reason why it renders it nonpatentable? Well, what That's not what we're talking about here. We're not talking about novelty, are we? No, we're really not. What the Court said in Bilski is that a conventional step plus a law of nature isn't sufficient. And what the Court explained in Fluke is that the law of nature is part of the common domain. It's part of prior art. So if you're adding prior art to prior art, it's nothing under Section 101. Mr. Shapiro, on that question and the questions Justice Scalia just raised, the government, you know, has taken the position that you're under the wrong section. It's not a question of patentability, but you used the example of the finger. You said it's obvious. So why didn't you raise the sections that the government says would have been the appropriate ones on the novelty or anticipation of prior art and obviousness? That's a very important question for the medical community. They need a robust Section 101 standard, because under 102 and 103, you could patent E equals MC squared. That's new. It's nonobvious. But you can't patent it under 101, because it's a law of nature. And it's important to keep this common domain, the storehouse of information that medical researchers need to have access to. Kennedy, it's hard to resist the temptation to peek into the obvious component or the nonobvious component and then go back and apply it to 101. But you want us to discipline ourselves to talk just about 101 in this. Well, no. I think we have two arguments on this point. The first is both Fluke and Bilski peeked, and they looked at the conventional nature of the additional step. But once you say conventional nature, you're saying it's not novel. If the step is not conventional, it's okay. Why? Well, because it's novel. This is the Court's 101 analysis in both Fluke and in Bilski. So we rely on the latest decision, Bilski, which took exactly that peek. But the other part of our answer is you don't even have to peek. If the step doesn't narrow the preemption of the natural phenomenon, if it's just an incidental step that you need to use to observe the natural phenomenon, which the Splod test is, you can't see the natural phenomenon. You're getting warmer, but the words, look, a simple conventional step. Hmm. Breyer. You see, whether it's true in this case or not, discovering natural laws is often a very expensive process. Oh, yes. And there's lots of investment to be protected. Oh, sure. But they can't. Okay? So now you're going to say, well, what do they have to add to that? And now we run into problems, because if you have to just not look at the law of nature, don't look at it when you decide whether it's novel. That not only runs into conflict with prior cases, but it doesn't make much sense, because really the novel thing is often the law of nature. But you say you have to add something. Yes. What? Now, that's what do you have to add? And it can't be that you take the law of nature out and look to whether the rest of it meets the patent criteria. It's pretty clear in the law, and I can give you reasons why, but forget the reasons. But, look, what do you want to say the rest of it has to add up to? In our view, the rest of it has to add up to some step that limits the natural phenomenon so that you have a concrete, specific. You're going on the limitation thing. So you're going to say reject all the 15 fancy hypotheticals. I'll also spare you. Well, in the Deere case. It's pretty easy to think of the same problem you have, you know, which doesn't have this infinity in it. In the Deere case, the net. That's unfortunate. We have to deal with it. In the Deere case, the natural phenomenon was limited with steps that confined the invention to a specific machine with doors opening and closing, temperature being monitored, so a product was cured. It was a very specific, concrete invention. I don't know what you keep saying you have to limit the product. Yes. But you told me that there's a different range for the treatment of skin diseases. Yes. So presumably there are different ranges for treatment of other diseases. Absolutely. So this patent has not limited exploration in there. You're claiming it has. That's an issue that your adversary can speak to. I think they say no in their briefs. But the point is there's still a limit to their range. You're claiming at one point they said it was limitless. But if we disagree with that, how do you answer that? How do you answer Justice Breyer's question? Here's what they say, Joint Appendix, pages 13 through 14, the second volume. This is their patent. This is what it covers. It covers hepatitis, lupus, Hashimoto's disease, Graves' disease, Addison's disease, diabetes, arthritis, and they say it even covers organ transplants. It covers heart, kidney, and liver transplants. So it covers every autoimmune disease. And there are dozens and dozens of them. And they do have different numbers. That's the key point. Sotomayor So do we add up all of the diseases in the world, all the potential diseases, and pick a percentage that this covers within that range? I think Justice Breyer is asking you for something that doesn't involve that, that involves some greater answer to the issue of limitation. I think what the Court did in Flook and what it did in Bilski is ask if a broad field is being preempted. This is broad numerically. It goes up to infinity. It covers dozens and dozens of autoimmune diseases. Scalia What if they just split up the patent? They got one patent number for arthritis, another patent number for transplants, another patent number for each one of the autoimmune diseases you're talking about. Would each of them be okay? Because it's. Scalia No, it wouldn't. That would be LabCorp, where there was just one malady in the patent. It was vitamin deficiency with a natural correlation. And Justice Breyer's opinion explained that. That is too preemptive of the natural phenomenon. Breyer Yes, but what my opinion lacked, frankly, and that's sometimes the virtue of a dissent in such a case, it lacked, and Novartis points this out very well in their brief, it lacked an explanation as to why what I thought was a patent just said, observe the correlation. Scalia Yes. Breyer Why isn't that an application of the law of nature? And if you look to LabCorp's dissent to find an answer to that question, you're better than I because I couldn't find it. Scalia Well, if observe the — that's another area of the breadth of this patent, because there's no specific action the doctor has to take. If the doctor has been informed of their range and draws blood and thinks about it, that's — that is — that is infringement. And a doctor here was accused of infringement, treble damages sought against this hospital, and an injunction, because she thought about this correlation, and she had completely different numbers. Kagan Mr. Shapiro, is there a patent that Prometheus could have written that you think would have met the 101 test? Shapiro Certainly. They could have said when you reach 400, a real number, a specific number, you adjust the dosage by 20 percent. That's a treatment patent. Kagan So if they had added a treatment protocol, that would have been a completely different case? Shapiro Yes. Kagan And what makes it a completely different case? Shapiro What makes it different is that leaves room for Mayo Clinic to come up with different numbers that it believes are more accurate and more helpful for patients that are suffering from these life-threatening diseases. We shouldn't require Americans to get one opinion from Prometheus when they want an opinion from Mayo Clinic. Kagan Well, I guess I'm not sure I understand that. You said a specific number. But suppose it uses ranges, but it also attaches treatment decisions to those ranges. Shapiro Well, that could be specific enough, again, that others could have a rival test that used a different treatment protocol. You'd have to look at that. Kennedy Then why didn't you answer her first question that it was not patentable? I have the same question. I think I'm having the same question as Justice Kagan. Why can't you just go, the hypothetical was one range, one result. Pardon me, one measurement, one result. Suppose that just continued over a range. And they said if it's 40, then you have this. If it's 50, you have this. Shapiro Well, I don't think they can wipe out the entire field so that others can't have rival tests that use different numbers. They've tried to do that, by the way. They have a total of eight patents here which use different numbers. But you can't preempt the whole field so others can't make any use of that. Kagan The question I'm asking is, in your response to me, is the difference that the extent of the ranges, or is the difference that there would be clear treatment decisions attached to those ranges? Shapiro I think you'd need both. You'd have to look at it in practical terms. Is there room for somebody else to make use of this natural correlation so that they could come up with different numbers, different ranges, and different treatments? And if there's room left, then there's no preemption of the natural phenomenon. That's a vastly different case, and that's what's missing here. I do see my time. Yes. Sotomayor Patents of this type are out there. Shapiro My view is there are only a couple of them. LabCorp is like this. This one is like this. The others that are referred to in these amicus briefs are vastly different. They're specific patents with specific treatment protocols. And by the way, the government admits this particular patent is invalid because it just attaches a mental step to prior art. And there are only a couple of them, to our knowledge, that would be affected by a decision in our favor. But a decision in our favor would protect the storehouse of information that doctors really need. They have to be able to look at the body's reaction to injections, pills, chemotherapy, radiation, and different hospitals have to have different opinions to safeguard the health of our people. So we urge the Court to reverse, and I would reserve the balance of our time. Thank you, Counsel. General Verrilli. Mr. Chief Justice, and may it please the Court, each party in this case has got a valid point. Mayo is correct that you can't get a patent by tacking a mental step onto an utterly conventional process for administering. Drugs and testing their effects. But that is an issue under Sections 102 and 103 of the Patent Act. Mr. Shapiro just told us, when I asked him that question based on your brief, that people need to know up front that this is not a patentable subject matter. Very important that it be 101 and not 102 and 103. So how do you answer his rejection of the adequacy of anticipating prior odd on obviousness? I think the answer, Justice Ginsburg, is that from the perspective of the United States and the PTO, it's exactly the opposite. That importing these, taking, as Justice Kennedy suggested, taking up the temptation to import a look into novelty and nonobviousness into the 101 inquiry is going to be very destabilizing. That 101, as Bilski said, is a threshold eligibility test, and the question is whether there is a process. Here, there is a process. It's the administration of a drug that changes the body chemistry, and there is then a test to determine the extent of the change, and then there is an inference at the end of the test. That's a process. I don't want to go into that. But in your test for that, I see on page 9 of your brief you say a classic patent-eligible process recites a series of acts performed in the physical world that transforms the subject of the process to achieve a useful result. So I have a great idea. You take wood, you put it on a grate, you light it, and you get heat. That is, recites a series of acts performed in the physical world that transforms the subject of the process, the wood, to achieve a useful result, which is heat. So I can get a patent for that. No, it's not novel. Well, no, no, no, no. Well, let me put it this way. You can't get a patent for it. That's patent eligible. But that's our point, Mr. Chief Justice, that the right way to look at this issue is under 102 and under 103. Why? Why is the question, because anything can be transformed into a process. Look at those real estate ones. I mean, you know, lawyers' ones. I have a way of making a great argument in the Supreme Court. You know, you could patent some of your arguments. And this is why not cut them off at the pass? That is, if you're really prepared to say, it has to do with process, not machines. In the 19th century, not many patent processes were granted. So they're rather special because of this special problem the Chief just noticed. So why not cut them off at the pass if you're prepared to say? I'm sorry. Well, I'll add a little bit to this, because I'm questioning what you say here in the other direction. You say if you just look at everything minus the law of nature, and that is a process that's otherwise known or obvious in light of the prior art, you can't patent it. That seems to me maybe goes too far the other direction, because we know that a lot of work goes into these laws of nature. But our position is a little different. All right. So there are both parts, but I'm more interested in the first part. Your Honor, if I could be quick, I do think that one has to think about if what this seems like a straightforward case on these facts, but if one thinks about the principles that Mayo is advocating and applying them in a different set of circumstances, I think you'll see the problems. Take, for example, nuclear stress tests that cardiologists use. That's a process. The patient gets on a treadmill, the heart rate gets elevated, radioactive dye gets put into the body, it allows an image to be taken of the heart with an x-ray machine that improves treatment. Now, the transformation there is, as in this case, incidental to the process. It's not the point of the process, but I don't think anyone would suggest that's not a patentable process. But under Mayo's test, it's not a patentable process.  Roberts, I was going to say, what is the great advantage you see of putting this critical question off until the 102-103 analysis, rather than cutting it off at the beginning, 101, which I understand your friend to say is very important, because you don't want people to have to pause terribly long to see if this is something they can do. As a practical matter, at the PTO, Mr. Chief Justice, it doesn't make any difference, because a PTO examiner gets a patent application and answers every question, 101, 102, 103, 112, makes a decision about all of them. So it's not going to lead to any benefit at the PTO. Roberts, what about litigation? It is easier to throw something out at the threshold level, isn't it, than to move further down the line? Not if one moves the novelty and the obviousness inquiries from 102 and 103 into 101. You've just taken the complexity of 102 and 103 and moved it into 101. Kennedy, it seems to me, that's a rough rule, that summary judgment would be much more easy, much easier under 101 than 102 and 103. I think this case is a pretty good illustration, Justice Kennedy, of why that's not true. Think of, if I may pick up on the question Justice Scalia asked my friend, think of all the trouble we're having in this case figuring out what the standard is, how much preemption is too much. How do you even figure out the scope of preemption? What you're actually doing here is multiplying a whole new set of very difficult, complex questions that you don't have to answer. If you're going to catch it under 102. And I guess I'm not sure why that's true. There was novelty here. There were some doctors who figured out some new things, which was new ranges of effective drug treatment. And so why do you think you're going to catch this as a 102 matter? If there is a problem here, it seems to me not the fact that there was something new. There was something new. It's that it's something else. Verrilli, But there was no new process, Justice Kagan. There's exactly the same process that already exists with a new inference drawn at the end, and that's why you can capture this under 102. And I do think it's important to think about, in terms of the points Mr. Shapiro is making, if this patent had involved, instead of standard old blood tests, had involved a breakthrough new test that allowed one to measure metabolite levels in a way that could never have been done before, of course the person who invented that could get this patent, even though it would have the excluding effect that Mr. Shapiro has identified. Similarly, if the drug is a breakthrough drug and a patentable drug, any use of the period, including a use in a test like this, would be an infringement under 271. And what about the discovery of a new physical change in the body caused by an old drug? You find that it affects another part of the human system. Is that discovery patentable? Well, I think that's a harder question, but there are, for example, and I think the Court was looking at some of this in the Carrico case on Monday, these follow-on patents with respect to pharmaceutical products where you patent it originally for one use and then you can later patent it when you discover a different use. And in fact, there's an entire regulatory system set up to deal with that, so I do think there are circumstances in which that can be patentable, yes. Alitoso, could I ask you about your argument that the correlations that were discovered and that are involved here are not natural phenomena because the thiopurine drugs are synthetic products of human ingenuity? I found that a little difficult to understand. Suppose someone discovers the level at which a human pollutant that's present in the atmosphere, in the air or the water, has an adverse effect on human health. Is that not a natural phenomena? The existence of a pollutant in the air and its effect probably is a natural phenomenon, but the difference here is that there's a conversion of the natural body chemistry. The metabolites wouldn't be in the body but for the administration of these drugs. And I do think if one were to say that that's an unpatentable natural phenomenon, and this is what I mean about the destabilizing risk of thinking about this as a 101 issue rather than 102 or 103, you're going to call into question lots and lots, thousands in fact, of medical use patents where the patent is administer a therapeutically effective dosage of this drug in order to treat this disease. Breyer, but this drug is patentable because it's a, what is the third word, you know, it's a combination of nature. What's the, it's a composition of matter. Yes, Justice Breyer, but those patents are not on the composition of matter. They don't have to be. You say it's, you'd say that where it's a new use, there was some specifications and the specifications limited the area over here, I think, tell me if I'm wrong because I'm really asking this question, they limited it over here, you see, and now we have a new use and we're saying this composition of matter is being used over here. So aren't you getting a, simply a different area where you're using the composition of matter? Well, but that's a use patent. That's not a composition of matter patent. That isn't a process patent. Yes. It's a process patent. It is a process patent. And the problem would be if one says. All right. Let me finish your sentence. If one says that it's non-patentable because all you're doing is patenting the application of a law of nature, you're invalidating all those process patents. Thank you.  Mr. Bress. Mr. Chief Justice, and may it please the Court. I'd like to start out, I think, with answering the question about what these patents cover and what they don't. And I'm going to answer that really not because I think it has any relevance to the 101 issue. I actually don't think it has any relevance to 101. And I'll explain that it does perhaps have relevance under 102 or 103 and why the difference matters, if I may. So the district, my friend is correct that in the district court, at the initial infringement stage, before the Court decided validity of the patent, we argued that the right way to look at our numbers was that we were claiming that if a doctor correlated or associated a number greater than 400 with toxicity, that's what we were claiming. That would be within our claim. And if the doctor correlated under 230 with not enough drug, well, we were claiming that as well. Now, the district court agreed with that and said that those were the ranges. But then it confused things a bit, and that's where we get to the 15 percent plus or minus point. The Court also said, and by the way, I think this is a correct reading, that when we said about 400, that means plus or minus 15 percent of 400, and about 230 plus or minus 230. And then the Court held that there was infringement, but it held it for two different reasons. It said that the patent for Mayo, which or the — sorry, not the patent, the product Mayo had, which, by the way, was awfully close, it was 235 to 450, fell within the 15 percent on the top side. It didn't look at the bottom side for purposes of this decision, but 450 was within 15 percent of 400. And it also said it violated it because 450 is greater than 400. At the court of appeals, we argued that the right way to read the district court's opinion was that you had to actually do that comparison, that the ranges, the 15 percents mattered, and that the doctor, in order to infringe, would have to look at the result and say, is this or isn't this greater than 400 and compare it to 400. Or 230. The court of appeals accepted that reading of it, and that reading wasn't disputed by Mayo. And on page 3A of the court of appeals' opinion, the court of appeals says it has to be compared to a predetermined number. I think you could go either way on this. I think, frankly, the Court could go back to the district court and look at that, perhaps. But the problem with that is that there was no objection at the court of appeals, and I think any objection to how the court of appeals understood it is probably waived at this point. Now for why it doesn't matter. If there's a problem with the broad ranges here, in other words, if there's a problem with the fact that we're saying over 400 indicates toxicity, let's think about what is that problem. Suppose we're right. I mean, at this stage, the Court certainly can't presume we're wrong in that. So let's suppose that we're right. If we're right, then we're simply claiming the fact that we found, that after you administer the drugs and determine the metabolite level, if it's over 400, it indicates toxicity. And that's a natural phenomenon. It is a – it's according to a law of nature, and I will agree with that, Your Honor. The term natural phenomenon, as this Court has used it, for instance, in Chakrabarty or in J.E.M., has referred to the difference between things that exist in nature with the intervention of man and things that exist without the intervention of man. So, for example, photosynthesis would be a process that is a natural phenomenon. On the other hand, crossbreeding plants to create a new variety, that wasn't a natural phenomenon. Alito, if photosynthesis is induced by a lamp inside a building, then it's not a natural phenomenon? I think you could probably get a patent. I think you could get a patent, Your Honor, on the use of a lamp to induce photosynthesis. But you couldn't claim the underlying process, is all I'm saying, of photosynthesis. I thought of two examples that will try to get you to talk about the problem that's really bothering me here anyway. I'd love to, Your Honor. Well, a patent for – we've discovered at some expense what counts as too little fertilizer and what counts as too much to make plants grow. A certain kind of fertilizer, very common. Say less than a quarter of an inch, forget it. More than half an inch, you're going to burn the plant. Imagine that. Law of nature, absolutely, about the chemicals in the fertilizer. Patent, a method for determining when there's too little or too much fertilizer. Put some fertilizer on a field and measure how much there is. We're in less than a quarter of an inch is too little and we're in more than half an inch is too much. Second example. Einstein never lived, but at a grasp expense, you invented E equals mc squared. Okay? A method for measuring energy, which is very useful, that comes out of a cyclotron. Put some stuff in a cyclotron, measure the stuff in, measure how much it comes out, and keep it at where in, where in, the missing part is, think about, where in, no. It says where in the missing part will be calculated as an amount of energy according to a formula E equals mc squared. Now, if your patent is valid, why aren't the two I just mentioned? And if you, if the two I just mentioned are valid, there is something wrong with this picture. Okay, Your Honor. I'll answer them in turn and then hopefully I'll get back to my range and explain what the 102, 103 problems are with that for you all as well. The first patent you've discussed, which is how best to use fertilizer, essentially, to grow plants. Patent-eligible subject matter, but clearly novel, and novel in a way that you could get rid of on summary judgment just as fast as you could get rid of it on 101. There's no advantage, in other words, to saying I'm going to label my summary judgment motion 101 and import lack of novelty into that versus saying I'm predictable. Where's lack of novelty? Nobody has these numbers before. They always thought it was a quarter of an, an eighth of an inch, and he's huge novelty. Your Honor, the law, as you well know, recognizes that under section 103, if something would have been obvious to someone with ordinary skill in the art, it would fall in obviousness. I mean, my point is, eighth versus, assume with me, the eighth versus quarter of an inch, which is the law of nature part, is not obvious. Your Honor, the first person who came up 10,000 years ago with the best way to do, to use fertilizer in a way that nobody had ever done before would presumably get it. If your question is, at what level of sort of microns you can draw the line between obviousness and novelty, those are, they're questions. No, no, my question is, what has to be added to a law of nature to make it a patentable process? And if you put too little in the answer to that question, I believe I can take things that, like E equals MC squared, and make them patentable. And if you put too much in, you're going to wreck your own case. So I'm very interested in hearing it. I will try very hard not to do either. Your Honor, this Court has looked at two different ways to try to limit what are laws of nature, abstract ideas, et cetera. One way as it is looked at is to say we need something physical. It has to be in the world. In other words, you have to move things, you've got to transform them, you have to apply machinery to them, that sort of thing. So we just know off the bat you're not literally claiming just a principle in the air. So in your example, if you used, you know, machines, implements, et cetera, to do it, at least we'd know that much. I think the problem that Your Honor is raising is more in the second stage, which is, okay, it isn't just a mere principle, I get that, but are we as a practical matter preempting an abstract idea in such a way that we are going to too greatly suppress follow-on invention? And the classic example of that, Your Honor, is the Morse case, of course. In Morse, there were two different claims that were being discussed, or actually eight different claims being discussed, but one of the claims had to do with the actual invention of how you can make a telegraph work. And Morse described a working telegraph system, and he got a patent for that. And the second one that he tried to claim was the use of electricity to write at a distance. And the reason he didn't get that one is that it was expressed at such a level, high level of abstraction, that it would preempt many, many things that he had never invented and never thought of. In fact, the Court's words were wonderful in that case. For ought we now know, the Court said, somebody may come up with wonderful inventions in the future, and of course now we have the fax machine, e-mail, et cetera. That's the right way to think about it, which is, is the — for the second step, which is, is what being claimed at such a high level of generality, that it's going to inhibit future innovation? Kennedy, why couldn't someone come up with the idea that at a level which is in the range that's within your patent, if at a certain level for a certain person of a certain age, if you administer a new drug, you have a new result? Why isn't that like the fax machine? Your Honor, in that case, they could get an improvement patent on it, first of all. No question about it, that they could apply for an improvement patent. But the Petitioner is saying that if you think about that, it's an infringement. Well, there's a — let me explain why I think there's not a problem with that, Your Honor. If you looked at the process for vulcanizing rubber, which Firestone patented many, many years ago, that involved you heat India rubber to a high temperature, you add sulfur and mineral salts, and that way you cure rubber into a usable way of using it. Now, many years later in Deere, this Court looked at an improved process, if you will, for making rubber, which allowed — which involved continuous measurement and the use of the Arrhenius equation to know when the rubber was cured. Now, there's no doubt that if somebody came out with the second one 10 years after Firestone had gotten the patent on vulcanization, they would have had to pay patent royalties for 10 years before their second one would have been free of patent royalties, right, because they would have had to respect the patent that Firestone got. So the simple fact, in other words, that there may be further improvements to what you've done isn't where the Court has ever drawn the line. And I do think that in conceptualizing where to draw these lines, because at the edges they're indeterminate, they're elusive, and you're going to be somewhat arbitrary, this is judge-made law. I think that what you've got to look to is what you've done before. And if we take this case in the spectrum of what this Court has looked at, where you've got Morse on one side, on that same side you've got Benson, which was simply a formula for converting binary-coded decimals to pure binary, which the Court said you could use for an infinite number of uses. It was way too broad. If you look at Bilski, a general way of a general concept of hedging, now, Bilski was limited, admittedly, and this Court discussed it, and said, well, they've tried to limit it with the conventional step of having the inputs determined by random analysis techniques. I'd like to focus on that for a second, because the Court said that was not significant extra solution activity. It wasn't enough to either render the process a physical one in the world or to narrow its scope. Well, why is that? Because random analysis techniques are themselves just an abstract idea. So you were adding one abstract idea to another one, and it's no wonder the Court found that it didn't narrow it to a patentable scope. Now, on the other side of the line, we've got cases like Tildman. Now, if you look at Tildman, Tildman was a patent on the fact that if you use water at a high heat and high pressure, you can separate out from fat bodies the fat, fatty acids on the one hand and the glycerin on the other. And this Court approved a patent process on that. Now, that's, of course, a natural law, Justice Alito, no question about it, in terms of is it a law of nature that makes you do that? Yes. But the Court was comforted in that case by the fact that the patent wasn't trying to generally monopolize the idea that water at high pressure and temperature is going to, in general, break bonds of chemicals. And it wasn't trying to either monopolize the whole idea of how you can separate fat acids and glycerin from fat bodies. There are other ways, including the use of sulfuric acid. Let's place this case in the continuum. Now, we're not trying to patent the general broad idea that you can use metabolite readings after you've administered a drug to determine what the likely, what the best level of the next administration might be. That would be kind of like the Morse patent, and that's not what we're doing. What we're talking about here is, A, a very specific class of drugs, the thiopurines. Used for treatment. Kagan.              Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. But you wouldn't file a patent like that. Because that clearly would have been patentable. Everybody agrees with that. Kagan. Kagan. I agree it would, Your Honor. Two responses, if I may. And I think the difference people are noting or some people are noting, is that this is not a treatment protocol, it's not a treatment regimen. All you have done is pointed out a set of facts that exist in the world, that exist in the world, and are claiming protection for something that anybody can try to make use of in any way, and you're saying you have to pay us. Your Honor, I don't agree with that description, but let me explain why. I thought you might not. Your Honor, first of all, most of the claims here have three steps. So you've got an administering step, which clearly carries its own benefits with it. It's not novel, but it's certainly a process step, and in and of itself could be a process. We couple that with determining. You determine the amount of metabolites, and the next step gives the doctor valuable information in order to decide what to do next. Now, why didn't we say if it's over 400, you must decrease? Because that doesn't correspond with how doctors practice medicine, Your Honor. So, for example, you've got a patient for whom you've got a particularly sharp outbreak of Crohn's disease. You may well be willing to go above the normal 400 level if your other tests, your liver toxicities, your white blood cell counts, et cetera, tell you that for this patient at this time, given that condition, I'm willing to risk some additional toxicity. On the lower end of the scale, you might have somebody under 230 who seems to be improving. They seem to be moving towards remission. Why push it? Why increase? And this is not unusual, and that's one of the things I think I've got to stress here is the notion of a patent only in the end producing information is old in this country. And, by the way, to produce the information, you're always going to have a step at the end that is some kind of an algorithm. It might be a very simple one, but it takes the data, the raw data, and turns it into something useful. So, for example, in the 19th century, there were patents on the use of electricity to locate veins of ore and valuable minerals in the ground. Now, that patent didn't say after you found it, you've got to dig it out. And according to Mayo, that would have to be the next step. But, of course, you might have reasons for digging it out or not digging it out, depending on your finances, depending on how deep it is, depending on what kind of ore it is, et cetera. There were patents on how to navigate your boat in the fog. It was a primitive sonar-based method. And it didn't tell you in the end you must steer your boat to X and go there. It just told you a likely way to go. There was a patent on that. Breyer. The only new thing about it is that it's a process that all the steps are all — it's a process to generate some useful information. Yes. All right? Fine. And the only new thing about it is the useful information. Anything like that in history, any patent case that comes to mind that you say that was okay? Can you think of one? Actually, Your Honor, yes. Why? Good. That's what I would like to know. Certainly. For example, there was a patent on the — and I can talk about modern ones, too, of course. But there was a patent on how to find the — where there is a leak in a water main. And it was using vibration of the — No, no. That's not what I'm thinking of. I'm thinking of a patent to find useful information that chickens can only eat so much chicken food that nobody's ever known before, you know. It's a — okay. Now, there's something like that. But they tell you the useful information that's going to be found right in the patent. In other words, we have a patent to discover some useful information, and here is the useful information, and now here is — see, that's what they're complaining about. I'm not sure that I'm understanding, Your Honor, because the patent that tells you where to find the ore is telling you what you're going to find. But you don't know what you're going to find because you don't know how much ore you're going to find? Let's see. Okay. Let me think about it. Well, and if we talk about modern days, because I think it's helpful now to move this forward, the Court has never suggested there's an extra statutory limitation that prevents patents on developing useful information, even if they have a mental step at the end. And what would — what do we have today? We've got inventions out there that, through identification of biomarkers or measuring the biomarkers, allow us to know which of ten particular cancer drugs is going to work for a particular patient. We've got patents on methods that allow us to identify the likely location and size of the next earthquake in the San Andreas Fault. We've got patents that allow us to determine where there is a crack and what type of crack in a nuclear reactor core. Now, according to Mayo, because all of these patents end with a mental step that produces information, they're no good, or perhaps if you look at them and say everything up to that algorithm at the end is old, you can't get a patent because you lack novelty. Now, it may be to — it may be, in fact, depending on the particular invention, that you should lose for lack of novelty on one or other of those, or that you should lose for lack — for obviousness. But under 101, these are precisely the sort of things that you should not lose. Breyer. What's your view? Okay, Your Honor, I'm happy to address that, too. The answer is no, and here's why. You should not lose it. You should not lose it. Correct. And this is why, and I'll use my own case as a wonderful example. So in our case, what existed before in the prior art, so to speak, was people knew that you could administer thiopurines for these particular diseases. And by the way, they're not all diseases, just — we do specifically exclude in these patents. For example, host versus graft disease, we exclude leukemia, et cetera. They're not in the asserted patents in this case. But in any event, administration of thiopurines to address certain diseases is old in the art. Different methods for finding analytes in blood cells, such as high-pressure liquid chromatography, old in the art, no doubt. They were used together before we did them, but why were they used? They were used by people who were trying to come up with what we came up with. They weren't doing it for fun. They were administering, they were determining, in order to try to find a new treatment method, a new way of calibrating the right dose for each individual patient based on their metabolism and help seriously ill patients. And the idea that we are not novel because people took some of the same steps along the way to invention that we actually succeeded in is wrong. And, in fact, this Court said so in American Wood paper, where it said that incomplete and unsuccessful attempts to invent will not render not novel the successful inventor. And in Bell, the Court said the difference between those who did not get the patents and Bell was only the difference between failure and success, and didn't say that because many of them had used similar methods, but had not understood that continuous electrical lines, as opposed to intermittent or pulsing electrical lines, was going to be the difference for a working telephone. Similar here. I don't think we ought to lose on novelty for that ground. But let's put that to the side, because that's for remand and it's something that, you know, hopefully I'll get a chance to do that. Scalia I suppose somebody thinks you're wrong, that the numbers you've come up with are wrong, and they want to develop better numbers that will help the medical profession. Your patent excludes them from doing that, right? Waxman No, Your Honor, and let's explain why not. And I'll even take, for purposes of this explanation, my brother's example of over 400 and under 230, because I don't think it matters. So you've got Dr. Elazari, who believes that the right ceiling level is 300, okay? So if she sees a patient and says, I'm going to, you know, I associate 290 with toxicity, that won't violate our patent, in the least. Our patent says if you associate over 400 with toxicity, that's within our range. If she associates 290 with toxicity, no violation. Now, getting more to the point, though, if we're totally wrong, let's assume we're off base and this doesn't work at all. There's another part of Section 101 that addresses that, and that's utility. And certainly Mayo would be able to come into court and say that patent has no utility, it's completely wrong, in fact, it's killing patients, and try to invalidate us on that ground. Similarly, suppose at the very edges of the spectrums that we're claiming, the answer is obvious. The answer is not novel. They can seek to try to invalidate our patents on that basis as well. These aren't 101 problems. Roberts. Well, it seems to me that's your — the problem with your whole approach is that every time you're pressed on 101, your answer is to fall back to 102 or 103 or the utility part of 101. And I'm just wondering why it's beneficial to essentially eliminate 101 and say, oh, we'll catch everything later on. Thank you, Mr. Chief Justice. I appreciate the question. I think that the answer is that when the problem is lack of novelty, when the problem is obviousness, the right place to go are the sections that actually have very clear rules on how to apply those, and that the problem with taking a shortcut in that section is that it doesn't just imbue its own notions or preconceived notions of what should be patentable and pour it into it as opposed to following those rules. And, of course, if you're going to follow those rules, you might as well follow them under that section. Now, it doesn't completely leave 101 bereft. This Court has said 101 is very broad, but it does have limitations. And if you look at a case like Morse, I think it helps explain it. Roberts. Roberts. Roberts. To interrupt, your friend's point is that if you don't do this, if you don't give 101 some more content, then the doctor is going to have to start worrying right from the get-go and then see, well, is there an exception that I might be able to rely on, as opposed to being able to say right away, I don't have to worry about this patent, I can treat the patient in this way. Well, Your Honor, again, if it's very clear that we're not novel, for example, if the government is correct here, that facially we lack novelty, it's no harder to proceed under 102 to achieve that goal than it is under 101. If you're going to proceed under 101, then we'll talk about principles that 101 is for. So 101, I think the primary, the two things it's for are it has to be a process in the physical world, a hands-on process, and it can't be so broad that it preempts all follow-on innovation. Those are the two things, you know, this Court speaks sometimes about statutory language and it has to do some work. Sotomayor, that's the work that. Sotomayor, what's your answer about why this is novel? Your Honor, before Prometheus, actually the inventors in this case in Montreal, came up with this method, doctors had no way to tailor for each individual based on their metabolism, the right dosage of these powerful but potentially toxic drugs. Roberts. Thanks, counsel. Mr. Shapiro, you have four minutes remaining. Justice Scalia asked the critical question here, what if you think these numbers are wrong, what happens for patients around the country? Well, that's just what we concluded, these numbers were wrong. They say you go up to 400 and above 400, it's bad, it's harmful. We found that the right range was 450 up to 700, and sometimes even above 700 to cure some of these very serious diseases, and that different opinion was blockaded by this treble damages lawsuit and a request for an injunction. So the wrong information is spoken for years. The solution to that is you're saying their patent is not useful. That it's not useful. That would be your defense. It's important that 101 be the robust test here. This is the only provision under which this Court has issued decision after decision for 150 years protecting the public domain. It's not some rough gauge. It is the critical test defining what's in the storehouse of information for medical researchers to use. And to reduce it to a dead letter here would be just contrary to this Court's precedence and very harmful to the medical community. This is very important to doctors around the country. Now, is this a natural process, the question was raised. Of course it's a natural process. These metabolites come from the liver. They don't come from a test tube. They don't come from a syringe. It's just like cholesterol. If I eat in a French restaurant, there's some human intervention there that gives me high cholesterol. And if I eat wild strawberries, there's no human intervention. But either way, the doctors get to look at my cholesterol and hypothesize ranges that they think are sensible. It's the very same phenomenon, entirely natural. Now, this is a clean legal issue under Section 101. It's always been a legal issue. They say Section 102 and 103 are the most elusive questions in the field of patent law. This is a 7-year-old lawsuit against a hospital. It's cost millions of dollars to defend. Two trips to this Court, two trips to the Federal Circuit. We're still litigating this treble damages case. It should be terminated under this Court's precedence, as the district court did, giving summary judgment. Sotomayor, I guess my problem is, if we call this just simply an application of natural phenomenon or of a natural process, why are treatment patents at all permissible? Meaning, if someone finds out that at level 300 it's bad and tells doctors to stop, that's natural, too. Yes. Well, I think that's right. That is a second issue. But the first issue here is the breadth of the preemption, which precludes anyone else in the country from saying, as Justice Scalia did, those numbers are wrong, and patients can't use those numbers safely, or they won't get cured of this disease. For 20 years, the public is stuck with the erroneous information. Now, counsel suggested it's narrow preemption because it doesn't cover host versus graft or leukemia. Those are not autoimmune diseases. Every autoimmune disease is swept in here, and there are dozens and dozens of them. They have different characteristics. You don't take a one-size-fits-all approach to autoimmune disease. There are different numbers for different diseases. That's what Mayo was trying to do, to have some personalized medicine for skin disorders. And they said that that is an infringement, and we're entitled to treble damages and an injunction. Now, is this like the Morse case? Yes, it is like the Morse case. Prometheus is trying to preempt diseases it never researched, and it's trying to preempt numbers that differ from its numbers fundamentally. They had the number 7,000 in their patented number. We thought the number should be 5,700. This is a very dangerous, toxic drug. If you get the wrong number set in concrete for 20 years, that is a huge problem for patients, and there are millions and millions of patients suffering from autoimmune disease. So we urge the Court to protect the research process here that's so fundamental to American health and to economy and the health care industry. We thank the Court. Thank you, counsel. Counsel, the case is submitted.